## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.L. by and through her mother, | : | |
| Latisha G., and LATISHA G. in her own | : | |
| right, individually and on her own behalf, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-1230 |
| | : | |
| PENNSYLVANIA LEADERSHIP CHARTER | : | |
| SCHOOL, | : | |
| | : | |
| Defendant. | : | |

MCHUGH, J.                                                                  DECEMBER 12, 2016

## MEMORANDUM

This case concerns an agreement reached between a parent and a charter school to settle claims arising under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* The principal question before me is whether such an agreement is enforceable in federal court when it originated during an IDEA "resolution meeting" but was finalized beyond the "resolution period" prescribed by statute. At first glance it might seem that refusing to entertain this action would undercut the goals of the IDEA. But based on the IDEA's plain text, and taking into consideration the complex two-track system of remedies that Congress created through the statute, I conclude that Congress made deliberate and strategic choices in structuring the Act, with the result that an agreement reached in this manner is unenforceable in federal court. Plaintiffs' Amended Complaint is therefore dismissed.

1

## I.      Background

### A.   The IDEA Framework

Before proceeding to the facts of this case, a brief discussion of the IDEA's terminology and complex remedial structure is necessary for context.

Congress enacted the IDEA to ensure that "all disabled children in states accepting federal funding for the disabled will receive a 'free appropriate public education,'" or FAPE.  *Jeremy H. ex rel. Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 274 (3d Cir. 1996).  The IDEA's FAPE requirement mandates instruction that is "designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982)).

In order to receive federal funds under the IDEA, a state must submit a plan of compliance to the Secretary of Education, who then distributes funding to the State Education Agency (SEA).  20 U.S.C. §§ 1412–1414.  The SEA in turn apportions funds to Local Education Agencies (LEAs) who actually provide services to children.  *Id.* § 1413(a).

The "primary vehicle" that LEAs use to "provid[e] [disabled] students with the required free and appropriate education" is the Individualized Education Program (IEP).  *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 264 (3d Cir. 2003).  An IEP is a regularly updated document that details the student's present levels of achievement and performance, sets measurable annual goals, and describes the special educational and related services designed to achieve those goals.  *See* 20 U.S.C. § 1414(d)(1)(A) (listing the required elements of an IEP).

Parents wishing to challenge some aspect of IEP development or implementation can initiate an administrative review process by submitting a "due process complaint" to their child's

LEA and to the SEA. *Id.* § 1415(b)(6).[1] Upon receipt of a proper due process complaint, the SEA assigns the matter to a special education hearing officer who schedules a "due process hearing." *Id.* § 1415(f)(1)(A). At the hearing's conclusion, the officer's findings are appealable or enforceable in state or federal court. *Id.* § 1415(i)(2)(A); *see also D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 276–78 (3d Cir. 2014) (holding that prevailing parties can enforce a hearing officer's favorable decision by bringing a civil action in federal court). In Pennsylvania, due process hearings are run by the Office for Dispute Resolution (ODR).

When the IDEA's predecessor, the Education for All Handicapped Children Act, was passed in 1975, the due process hearing was the only statutory mechanism for resolving disputes between parents and LEAs. However, Congress expressed concern that these adversarial proceedings "bre[d] an attitude of distrust between the parents and the school personnel" and discouraged parties from "working cooperatively to find the best education placement and services for the child." H. R. Rep. No. 108-77, at 85 (2003). Accordingly, Congress amended the IDEA in 1997 and again in 2004 to facilitate the amicable resolution of differences prior to the formal due process hearing. *See* Pub. L. No. 105-17 (1997); Pub. L. No. 108-446 (2004). The IDEA now provides for two alternative dispute resolution mechanisms: the "resolution meeting" and accompanying "resolution period," and the "mediation process." Each is considered briefly.

*1.   The Resolution Meeting and Resolution Period (Resolution Process)*

Today, when an LEA receives a proper due process complaint, it has 15 days to convene a "resolution meeting," which functions as a kind of pretrial settlement conference in advance of the

---

[1] A due process complaint must identify the child, the child's school, "[a] description of the nature of the problem . . . including facts relating to the problem," and "[a] proposed resolution of the problem to the extent known and available to the party at the time." *Id.* § 1415(b)(7)(A)(ii).

due process hearing.  34 C.F.R. § 300.510(a).  The meeting allows parents to "discuss their complaint, and the facts that form the basis of the complaint," and gives the LEA "the opportunity to resolve the complaint."  20 U.S.C. § 1415(f)(1)(B).  To ensure productive resolution meetings, the IDEA requires the attendance of "a representative of the [LEA] who has decision-making authority."  *Id*.  If the LEA fails to produce the required decision-maker, parents can "seek the intervention of a hearing officer."  34 C.F.R. § 300.510(b)(5).  If a settlement agreement is reached "at a [resolution meeting]"[2] the parties can execute an agreement that is enforceable in state or federal court.  *Id*.

In addition to the resolution meeting, the IDEA also provides for a 30-day "resolution period," which begins when the LEA receives a proper due process complaint.  *Id.* § 500.510(b).  After the resolution period, parties can initiate a formal due process hearing.  20 U.S.C. § 1415(e)(2)(B).  Because the resolution meeting must be held no later than 15 days following receipt of a proper due process complaint, the resolution period effectively directs parties to wait at least 15 days following the resolution meeting before abandoning efforts to resolve their differences outside the context of an adversarial hearing.  Nevertheless, parties remain free to expand or contract the timeframe between the filing of a due process complaint and the initiation of a due process hearing.  If settlement talks are promising, parties can petition the ODR to delay the date of the due process hearing to allow additional time for negotiations.  Alternatively, if the parties agree that no amicable settlement is possible, they can mutually waive both the resolution meeting and the resolution period and proceed directly to a due process hearing.  *Id.* § 1415(f)(1)(B)(i).

---

[2] The text of 20 U.S.C. § 1415(f)(1)(B)(iii) grants federal courts jurisdiction to enforce agreements "reached at a meeting described in clause (i)."  Clause (i), in turn, describes the requirements and purpose of a "preliminary meeting," which the operative regulations—34 C.F.R. § 300.510(a)—refer to as a "resolution meeting."

For the sake of convenience, I refer collectively to the resolution meeting and the resolution period as the "resolution process."

### 2. *The Mediation Process*

In addition to the resolution process, the IDEA provides for a mediation process that allows parties to avoid due process hearings by submitting their disputes to "a qualified and impartial mediator who is trained in effective mediation techniques" and is provided at state expense. *Id.* § 1415(e)(2). As with the resolution meeting, the IDEA includes various procedural safeguards designed to ensure effective mediation sessions. For instance, § 1415(e)(2)(A) requires that both parties voluntarily agree to mediation and that LEAs refrain from using mediation "to deny or delay a parent's right to a due process hearing." And § 1415(e)(2)(B) mandates that "each session shall be scheduled in a timely matter and shall be held in a location that is convenient to the parties." Any settlement agreement reached "through" the mediation process is enforceable in federal or state court. *Id.* § 1415(e)(2)(F).

### B. Facts and Procedural History

With that context, I now proceed to the facts of the case, where a settlement agreement was reached outside the context of the resolution and mediation processes. Latisha G. brings this action on her own behalf and on behalf of her daughter, T.L., now 17 years old (Plaintiffs). T.L. attended ninth and tenth grade at Defendant Pennsylvania Leadership Charter School in Chester, Pennsylvania, an LEA within the meaning of the IDEA. T.L. has primary disabilities in reading and mathematics and a secondary disability of "speech or language impairment." Am. Compl. ¶ 21. While the Amended Complaint does not specify the precise timing of T.L.'s diagnosis, it appears that her disabilities were known by the time she entered Pennsylvania Leadership Charter School and that, as of ninth grade, she had an IEP that called for specially designed instruction.

Concerned over the quality of T.L.'s schooling at Pennsylvania Leadership Charter School, Latisha G. enrolled her daughter in a tutoring program at Recovery Educational Services (RES), a local organization founded and run by the Rev. Dyheim Watson.  Rev. Watson also helped Latisha G. secure counsel and file a due process complaint alleging that Defendant failed to implement T.L.'s IEP, depriving her of the FAPE that is her right under the IDEA.  Rev. Watson performed a similar service for the parents of seven other children at Pennsylvania Leadership Charter School.

Latisha G. filed a due process complaint in June 2015.  The SEA referred her case to the ODR, which assigned the case to Hearing Officer Charles Jelley, who scheduled a due process hearing for August 11, 2015.  Defendant held a resolution meeting with Latisha G. on July 28, 2015.[3]  On that day and the following day, July 29, Defendant also held resolution meetings with the parents of the seven other students who filed due process complaints with Rev. Watson's assistance.

Plaintiffs claim that their resolution meeting was deficient in two respects.  First they describe the meeting as a summary affair, with an hour of discussion allotted to the due process complaint—"an insufficient amount of time to fully discuss T.L.'s claims[.]"  Am. Compl. ¶ 37. Second, Plaintiffs allege that no one with decision-making authority from Pennsylvania Leadership Charter School attended the resolution meeting, a violation of the IDEA's requirements.  While the record does not disclose precisely who attended Latisha G.'s resolution meeting, it is clear that both she and Defendant were represented by counsel and that Rev. Watson was also present on Latisha G.'s behalf.

---

[3] It is unclear from the record if Defendant held the resolution meeting within 15 days of receiving Plaintiffs' due process complaint, as required by statute, or whether more than one filing was required to perfect the complaint, but neither party makes an issue of the timing of the resolution meeting.

Despite its shortcomings, the resolution meeting between Latisha G. and Defendant kicked off a productive round of settlement negotiations.  "Just a few days" after the preliminary meeting, the parties requested that Hearing Officer Jelley postpone the due process hearing until September 11 to allow them additional time to agree to terms.  The due process hearing was duly postponed and on September 2, the parties requested a conditional order of dismissal because the case was "all but settled."  Am. Compl. ¶ 45.  Hearing Officer Jelley issued the requested order and by September 16—roughly six weeks after the resolution meeting—both parties had signed a finalized Settlement Agreement (Agreement).

Under the Agreement, Defendant committed to providing Plaintiffs with funds to secure 1,400 hours of "compensatory services," defined broadly as "special education and tutoring and other academic supports," various forms of "individual or group therapy," and "counseling."  Mot. to Am. Compl. Ex. A at 3.  The Agreement allowed Latisha G. to "choose whatever mixture of expensive and inexpensive services that [she] prefers," but it capped the "maximum aggregate cost to the school" at $84,000 and required that all funds be spent by the time T.L. reaches 21 years of age.  *Id.*  The terms of the Agreement required Latisha G. to either front the costs of T.L.'s compensatory services and apply to Defendant for reimbursement, or to provide invoices "from a service provider on its letterhead" so that Defendant could make direct payments to that service provider.  *Id.* at 4.  In addition to the $84,000 in compensatory services funds, Defendant also agreed to provide Plaintiffs with $12,530 in attorney's fees.

In exchange for the promised compensatory services funds and attorney's fees, Plaintiffs waived all claims against Defendant "arising out of or relating to the education of the Student from the beginning of time through the end of time," and relinquished their statutory rights under the IDEA, Rehabilitation Act, and Civil Rights Act.  *Id.*  The Agreement did, however, expressly

reserve the parties' rights "to litigate issues of non-implementation of this Agreement."  *Id.*

Plaintiffs also agreed that T.L., who had by this point stopped attending Pennsylvania Leadership

Charter School, would not reenroll.  Finally, the Agreement denied any admission of wrongdoing

by any of the parties.

      In reliance on the Agreement, Latisha G. contracted with RES to provide T.L. with

supplementary educational services.  Per the terms of the Agreement, RES submitted invoices to

Defendant for the cost of services rendered to T.L.  According to Plaintiffs, Defendant has refused

to pay these invoices without offering any explanation or excuse.  At the time this action was

initiated, RES was owed approximately $24,000.  The Amended Complaint implies that the

parents of the other seven children who filed due process complaints with Rev. Watson's

assistance also contracted for RES's services and that Defendant has likewise refused to pay their

invoices.

      Based on these facts, Plaintiffs brought an administrative action in the ODR seeking

enforcement of the Agreement under the IDEA and the Rehabilitation Act.  The Hearing Officer in

that case refused to rule on Plaintiffs' claims because he found that doing so would require him to

interpret and enforce the provisions of a contract, something that exceeded his statutory

jurisdiction.

      Having failed in their administrative action, Plaintiffs filed a five-count complaint in

federal court.  In Count I, Plaintiffs seek enforcement of the Agreement under the IDEA as

codified at 20 U.S.C. § 1415(f)(1)(B)(iii).  In Count II, Plaintiffs claim that Defendant retaliated

against them in violation of Section 504 of the Rehabilitation Act.  In Count III, Plaintiffs recast

their Section 504 retaliation claim as an action under the IDEA "and/or" § 1983.  In Count IV,

Plaintiffs seek enforcement of the Agreement pursuant to Section 504, § 1983, and an unspecified

provision of the IDEA. [4]  And in Count V, Plaintiffs bring a state law breach of contract claim.

Defendant now moves to dismiss the complaint on two alternative grounds.  First, it brings a

12(b)(1) motion to dismiss for lack of subject matter jurisdiction under 28 U.S.C. § 1331.  In so

doing, Defendant attacks the Amended Complaint on its face without contesting any alleged facts.

Second, to the extent this Court has subject matter jurisdiction over any of Plaintiffs claims,

Defendant brings a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be

granted.

## II.     Standard

In considering a 12(b)(6) motion, the court must first separate the factual and legal

elements of a claim, accepting as true all well-pleaded facts while disregarding any legal

conclusions.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  The court must then

"determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a

'plausible claim for relief.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Motions to dismiss under Rule 12(b)(1) can be either facial or factual.  Where, as here, the

party bringing a 12(b)(1) motion attacks the complaint on its face and does not contest the facts

alleged by the non-moving party, the 12(b)(1) motion is treated "like a 12(b)(6) motion" and the

court must "consider the allegations of the complaint as true."  *Hartig Drug Co. Inc. v. Senju*

*Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).

---

[4] It is unclear how the IDEA and Section 504 claims in Count IV differ from those in Count I and Count II.  The only IDEA provision that entitles Plaintiffs to enforce the Agreement is set forth at 20 U.S.C. § 1415(f)(1)(B)(iii).  Moreover, although the enforcement of the Agreement is a remedy available under Section 504's anti-retaliation regulation—*see* discussion *infra* pp. 16–17—there is no apparent basis for Plaintiffs' separate Section 504 enforcement action under Count IV.  I therefore read the IDEA and Section 504 claims contained in Count IV as wholly subsumed within Count I and Count II, respectively.

III.    **Discussion**

    A.  Enforcement of the Agreement Under the IDEA (Count I)

Plaintiffs seek enforcement of the Agreement pursuant to 20 U.S.C. § 1415(f)(1)(B)(iii),

which grants federal courts jurisdiction to enforce the terms of an agreement that is "reached at a

[resolution meeting]."  Defendant points out that the Agreement was not finalized until six weeks

after the resolution meeting of July 28, 2015, and was thus not reached "at" that meeting.

Defendant therefore argues that this court lacks jurisdiction to enforce the Agreement and that

Plaintiffs must instead bring their claims in state court as a breach of contract action.

Plaintiffs contend that Defendant's "cramped and unrealistic construction" of

§ 1415(f)(1)(B)(iii) ignores practical realities of IDEA settlement negotiation.  Resp. at 9.

According to Plaintiffs, "[l]ike any other settlement process," negotiations between parents and

LEAs "often require several days or weeks" to conclude.  *Id.* at 8.  Moreover, Plaintiffs note,

Congress created resolution meetings to encourage parties to settle disputes outside formal due

process hearing.  To effectuate this goal, Plaintiffs maintain that federal jurisdiction should extend

to all settlement agreements reached through an open-ended negotiation process, so long as talks

began at a resolution meeting.

Every federal court that has interpreted 20 U.S.C. § 1415(f)(1)(B)(iii) has found that the

precisely worded grant of jurisdiction to enforce settlement agreements reached "at" resolution

meetings simultaneously deprives federal courts of jurisdiction to enforce settlement agreements

reached outside the context of these meetings.[5]  Many of these courts explicitly rejected policy

---

[5] *See, e.g., H.C. ex rel. L.C. v. Colton–Pierrepont Cent. Sch. Dist.,* 341 F. App'x 687, 689 (2d Cir. 2009); *T.D. v. LaGrange Sch. Dist. No. 102,* 349 F.3d 469, 479 (7th Cir.2003); *Hernandez v. McAllen Indep. Sch. Dist.*, No. 7:15-CV-397, 2016 WL 159953, at *3–4 (S.D. Tex. Jan. 13, 2016); *L.M. v. Lower Merion Sch. Dist.*, No. CIV.A. 10-4855, 2011 WL 71442, at *3–4 (E.D. Pa. Jan. 7, 2011); *J.M.C. v. La. Bd. of Elementary & Secondary Educ.,* 584 F.Supp.2d 894, 897

arguments similar to those that Plaintiff raises here, finding, in the words of one judge, that "it is not the role of the courts to append new provisions to statutes whenever doing so might comport with some of Congress's goals." *Bowman v. D.C.*, No. CIV.A.05-01933(HHK), 2006 WL 2221703, at \*2 (D.D.C. Aug. 2, 2006).

I join those courts and decline to give 20 U.S.C. § 1415(f)(1)(B)(iii) the expansive interpretation urged by Plaintiffs. But I add that what may seem on first glance to be a harshly narrow interpretation of the statute is actually reasonable when considered in light of the IDEA as a whole.

Plaintiffs claim that a literal reading of § 1415(f)(1)(B)(iii) runs contrary to the IDEA's pro-settlement policy because it forecloses federal enforcement of settlement agreements finalized outside of resolution meetings. But this argument renders the resolution period superfluous and ignores the mediation process.

By creating the resolution period, Congress directed parties to wait at least 15 days after a resolution meeting before proceeding to a formal due process hearing. Neither the text of the IDEA, nor its statutory history, nor its implementing regulations, shed light on the significance of this provision with respect to federal courts' jurisdiction to enforce IDEA settlements. Nor has any court addressed this issue. However, the most reasonable interpretation of the statute is that Congress intended that settlements reached but not finalized at resolution meetings would still be enforceable in federal court so long as they were finalized during the resolution period.

Under any contrary reading, it is difficult to see what purpose the resolution period would serve. The resolution period does not necessarily determine the amount of time that passes

---

(M.D. La. 2008); *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, No. 5:06CV139, 2007 WL 2219352, at \*6–7 (W.D. Mich. July 27, 2007), *aff'd*, 615 F.3d 622 (6th Cir. 2010).

between a resolution meeting and a due process hearing.  Rather, as was the case here, parents and LEAs can postpone their due process hearings in order to continue settlement negotiations. Moreover, the IDEA's implementing regulations permit parties to waive the resolution process entirely and proceed directly to a due process hearing if they agree that no settlement is possible. 34 C.F.R. § 300.510(c).  Unless the resolution period is nothing more than an optional and utterly pointless detour on the route to a due process hearing, it is necessary to read the IDEA as conferring federal jurisdiction over settlements reached at the resolution meeting and then finalized later during the resolution period.  Viewed in that way, the logic behind the resolution period is not hard to discern.  It takes into account the practical realities of finalizing an agreement, while simultaneously imposing an outside time limit to remain consistent with the statutory goal of prompt dispute resolution.[6]

Such an interpretation is consistent with that of the ODR, the state agency responsible for conducting due process hearings in Pennsylvania.  In a guidance document posted on its website, the ODR explains that a "resolution meeting agreement" is a written agreement "reached at a resolution meeting" and that "if either [the parent] or the school believes that the other has failed to live up to the terms of the agreement, either has the right to bring a lawsuit in state or federal court."  Office for Dispute Resolution, *Understanding Special Education Due Process Hearings: A*

---

[6] The IDEA's goal of prompt dispute resolution has been consistently recognized by courts interpreting the statute.  For instance, in *Spiegler v. District of Columbia*, the D.C. Circuit noted that Senator Williams, the principal author of the Education for All Handicapped Children Act, stressed "the urgent need for prompt resolution of questions involving the education of handicapped children."  866 F.2d 461, 467 (D.C. Cir. 1989).  *See also Dudley v. Lower Merion Sch. Dist.*, 768 F. Supp. 2d 779, 784 (E.D. Pa. 2011) (finding that defendants' position "would produce long delays, contrary to IDEA's policies favoring prompt resolution of disputes" (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 116 (1st Cir. 2003))).

*Guide for Parents* (*Guide for Parents*) 62, http://tinyurl.com/ODR-Guide (last visited Dec. 8, 2016).  Later in the same publication, however, the agency warns that:

> Any settlement agreement occurring or finalized after the expiration of the 30-day resolution period does not constitute a resolution meeting agreement, but rather a private settlement agreement between a parent and the LEA[.]

*Id.* at 215.[7]  The clear implication of ODR's warning is that only an agreement reached at a resolution meeting and finalized during the 30-day resolution period is a "resolution meeting agreement" enforceable in federal court.

Here, the Agreement was not signed until six weeks after the resolution meeting itself, so necessarily it exceeds the 30-day resolution period.  If, as Plaintiffs argue, 20 U.S.C. § 1415(f)(1)(B)(iii) grants federal courts jurisdiction to enforce all settlements arising out of an open-ended resolution process, the resolution period is rendered meaningless.

Plaintiffs' argument is further undermined because, through the mediation process, Congress created an alternative that accommodates the prolonged settlement negotiations that Plaintiffs claim are the norm in the IDEA context.  While 20 U.S.C. § 1415(f) only requires a single resolution meeting, § 1415(e) clearly contemplates multiple mediation sessions.  For instance, § 1415(e) repeatedly refers to a mediation "process" and § 1415(e)(2)(B) mandates that "*each* session in the mediation process" be scheduled in a timely manner and at the convenience of the parties (emphasis added).  Furthermore, while § 1415(f)(1)(B)(iii) limits federal jurisdiction to settlement agreements reached "at" a resolution meeting, § 1415(e)(2)(F) uses different and broader language, granting courts authority to enforce any settlement agreement reached "through" mediation.  In short, § 1415(e) allows parties to engage in protracted settlement talks and then to enforce any resulting settlement in federal court.  It therefore refutes Plaintiffs' claim that an

---

[7] The above-quoted warning is included in the "Resolution Meeting Data Sheet," a form that LEAs must complete and submit to ODR after each resolution meeting.  The Resolution Meeting Data Sheet is included in ODR's *Guide for Parents* as Appendix S.

expansive reading of § 1415(f)(1)(B)(iii)'s grant of federal jurisdiction is necessary to accommodate common practice in IDEA settlement negotiations.  Accordingly, I refuse to give § 1415(f)(1)(B)(iii) the strained interpretation urged by Plaintiffs.[8]

Plaintiffs next argue that if I conclude that federal jurisdiction is limited to settlement agreements reached at a resolution meeting, I should nonetheless make an exception in this case because Defendant scheduled only an hour for the resolution meeting and failed to produce a representative with decision-making authority.  Plaintiffs characterize these shortcomings as an attempt by Defendant to "intentionally protract" the negotiation process beyond the resolution meeting.  Resp. at 6.  Plaintiffs argue that "reward[ing]" Defendant by refusing to exercise jurisdiction over the Agreement would encourage schools to "manipulate" the IDEA process to deprive Plaintiffs of recourse to the federal courts.  *Id.*  I disagree.

There is nothing to support Plaintiffs' claim that their one-hour resolution meeting was so grossly inadequate that it deprived them of their procedural rights.  Neither the IDEA nor its implementing regulations mandate resolution meetings of longer than one hour, and Plaintiffs plead no facts to suggest that an hour-long meeting is contrary to common practice in the IDEA

---

[8] I note that the Sixth Circuit has held that parties can also use contractual terms to extend settlement negotiations beyond the resolution meeting without losing the ability to enforce agreements in federal court under § 1415(f)(1)(B).  *F.H. ex rel. Hall v. Memphis City Sch.*, 764 F.3d 638, 644–45 (6th Cir. 2014).  *F.H.* concerned a federal court's authority to enforce a settlement agreement that was finalized three months after the resolution meeting, and which contained information that was unknown to the parties at the time of the resolution meeting.  *Id.* at 645.  Although the agreement could not have been reached during a resolution meeting, it included a term stating that "[t]his Agreement was reached at a Resolution Session and is enforceable . . . pursuant to 20 U.S.C. § 1415(f)(1)(B)(iii)."  *Id.*  In upholding the district court's exercise of jurisdiction, the Sixth Circuit observed that "agreements reached during a meeting are often refined and finalized long after the meeting concludes" and that "requiring that a settlement agreement be written, finalized, and signed during a settlement conference would be counter to the usual practice."  *Id.*  However, rather than reading § 1415(f)(1)(B)(iii) to confer federal jurisdiction over all settlement agreements reached after a resolution meeting, the court found that the jurisdictional question was "answered by the terms of the Settlement Agreement itself" and that the contractual term, "bargained for and agreed to by both parties, controls here."  *Id.*

14

context.  Similarly unavailing is Plaintiffs' attempt to bootstrap federal jurisdiction based on the absence of a decision-maker at the resolution meeting.  The IDEA's operative regulations enable parents to hold LEAs accountable when they violate the procedural safeguards governing resolution meetings.  Specifically, 34 C.F.R. § 300.510(b)(5) allows a parent to "seek the intervention of a hearing officer" if an LEA decision-maker fails to attend the resolution meeting. Were this a case where an LEA exploited an unrepresented parent's lack of sophistication in order to shirk its duty under the IDEA, Plaintiffs' argument might be stronger.  But here, Plaintiffs were represented by counsel[9] at the resolution meeting and could have taken advantage of the IDEA's built-in sanctions to enforce Defendant's compliance with the statute.  Instead, Plaintiffs opted to look past Defendant's procedural violation and proceed with negotiations outside the context of the resolution process.  Having made this choice, they cannot now manufacture federal jurisdiction to enforce the Agreement based upon Defendant's failure to produce a decision-maker at the resolution meeting.

In conclusion, where a choice is made to pursue a student's rights through a resolution meeting, but settlement takes place beyond the resolution period, and outside of the IDEA mediation process, a federal court lacks jurisdiction to enforce the Agreement.  Accordingly, Defendant's 12(b)(1) motion is granted as to Count I and Plaintiffs' action to enforce the Agreement pursuant to 20 U.S.C. § 1415(f)(1)(B) is dismissed.

B.   Claims for Retaliation Under Section 504 of the Rehabilitation Act (Count II)

Plaintiffs' retaliation claim arises under the regulations implementing Section 504 of

---

[9] From the record, it appears that different counsel represented Plaintiffs during the negotiation phase of this case.

the Rehabilitation Act,[10] which provide that:

> No recipient [of federal funds] or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by the [Rehabilitation Act], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing[.]

34 C.F.R. § 100.7(e).[11]

As a threshold matter, Defendant argues that, under the Agreement, Plaintiffs "waived . . . their . . . claims for retaliation asserted under any federal statute," and therefore possess "only a state common law claim" to challenge "non-implementation of the Agreement."  MTD at 16. Defendant mischaracterizes the parties' rights under the Agreement.  That document does not impose the restrictions described by Defendant; quite the contrary, it provides that "[n]othing in this Agreement shall be construed as limiting the right parties to seek enforcement of this Agreement . . . by action at law or equity or by any other legal proceeding."  Mot. to Am. Compl. Ex. A at 6.  Moreover, Plaintiffs may use their retaliation claim as a vehicle to enforce the Agreement. The Third Circuit has held that "[t]he remedies for violation of Section 504 . . . include . . . forms of relief traditionally available in suits for breach of contract." *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir. 2007).  Thus, Plaintiffs are entitled to argue that

---

[10] Section 504 itself states that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

20 U.S.C. § 794(a).

[11] The above quoted anti-retaliation regulations were enacted pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 200d *et seq.*  These regulations were incorporated into the Rehabilitation Act in 1978 when that act was amended to provide the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964."  29 U.S.C. § 794a(2).

"[e]nforcement of the Settlement Agreement is necessary . . . to remedy the violations of Plaintiffs' procedural rights . . . under Section 504[.]"  Am. Compl. ¶ 86.  Because Plaintiffs bring their retaliation action as a means to enforce the Agreement, their claim is not barred by their waiver of statutory rights and must be addressed.

To bring a claim a claim for retaliation under Section 504 of the Rehabilitation Act, plaintiffs must show:

> (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action.

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

According to Plaintiffs, Latisha G. undertook three protected activities:  she filed a due process complaint; she attended a due process hearing; and she enlisted Rev. Watson's assistance in pressing her claims.  Plaintiffs contend that Defendant has retaliated because it negotiated a settlement agreement that it never intended to honor.  To support that allegation, Plaintiffs further maintain that Defendant has also refused to release settlement funds in the seven other instances where families turned to Rev. Watson, while honoring all other IDEA settlements.

### 1.  Protected Activity

Plaintiffs are correct that a parent's "invocation of IDEA due process proceedings for her children . . . constitute[s] a protected activity" within the meaning of Section 504.  *Hesling v. Avon Grove Sch. Dist.*, 428 F. Supp. 2d 262, 270 (E.D. Pa. 2006).  But it does not follow that Latisha G.'s association with Rev. Watson was similarly protected.

The Rehabilitation Act protects anyone who attempts to safeguard the rights of a disabled child, not just the parents of that child.  *See, e.g.*, *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126 (10th Cir. 2010) (granting standing to a speech-language pathologist suing because

of retaliation for her advocacy on behalf of disabled students); *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821 (9th Cir. 2009) (holding that a teacher had standing to sue for retaliation under Section 504 after she was fired, allegedly because she advocated for disabled students).  Thus, if Defendant punished Rev. Watson for advocating on T.L.'s behalf, then Rev. Watson himself would be entitled to pursue a retaliation claim.  It is far from clear, however, that Plaintiffs can assert Rev. Watson's claim vicariously, and there is reason to doubt their ability to do so by characterizing their "choice of advocate" as a protected activity.  Nothing in the IDEA provides parents with a right to have a non-legal advocate at a resolution meeting or at informal settlement talks.  Moreover, it is not obvious that one's choice of advocate constitutes "testi[mony], assist[ance], or participat[ion]" within the meaning of 34 C.F.R. § 100.7(e).  In any case, Plaintiffs fail to acknowledge the novelty of their "protected activity" claim and they make no legal argument to justify their requested extension of the law.  I therefore decline to find that Latisha G.'s decision to enlist Rev. Watson's assistance was protected activity.

Nevertheless, it is beyond dispute that Latisha G.'s filing of a due process complaint and participation in a resolution meeting are both forms of advocacy that are safeguarded by the Rehabilitation Act.  Plaintiffs have therefore established the protected activity element of their retaliation claim.

### 2.  *Deterrent effect of allegedly retaliatory activity*

Defendant argues that the alleged retaliatory conduct—negotiating a settlement in bad faith—would not deter the exercise of IDEA rights since it would simply dissuade a reasonable person from entering into voluntary settlement negotiations rather than proceeding to a formal due process hearings.  However, this argument ignores the fact that the IDEA gives parents the procedural right not only to a due process hearing, but also to the resolution and mediation

processes.  If LEAs regularly entered into settlement agreements with no intention of honoring their contractual obligations, then parents would be unlikely to exercise their statutory right to use the IDEA's alternative dispute resolution mechanisms.  I therefore find that Plaintiffs have established the deterrence element of their retaliation claim.

### 3.   Causal connection between the protected activity and the retaliatory action

To establish causation, Plaintiffs must demonstrate "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W.*, 480 F.3d at 267. Ultimately, Plaintiffs fail to prove either.

The fatal flaw in Plaintiffs retaliation claim is that the protected activity at issue did not beget any retaliatory action by Defendant.  Rather, Latisha G.'s initiation of the IDEA resolution process touched off six weeks of settlement negotiation that ultimately resulted in a legally binding contract entitling her to compensatory education funds and attorney's fees.  In an effort to create a temporal link between Latisha G.'s protected activity and Defendant's alleged failure to pay RES's invoices, Plaintiffs argue that Defendant negotiated and finalized the Agreement, all the while intending to renege on its commitments.  To accept Plaintiffs' allegation is to accept an improbable scenario in which Defendant engaged in protracted settlement talks and exposed itself to nearly $100,000 in contractual liability merely out of spite.  Plaintiffs plead no facts to support their theory of an elaborate, and in many ways self-defeating, retaliatory ploy.[12]  Although I seldom invoke *Twombly* and *Iqbal*, because I believe those decisions are applied too broadly, this is a case

---

[12] There is close temporal proximity between Latisha G.'s decision to contract with RES and Defendant's failure to honor the terms of the Agreement.  But Plaintiffs do not claim that Latisha G.'s choice of how to spend settlement funds was a protected activity under the Rehabilitation Act and no court has considered whether an attempt to enforce a settlement agreement constitutes protected activity under Section 504.

where the plausibility standard has genuine applicability.  Defendant's 12(b)(6) motion as to

Plaintiffs' Rehabilitation Act claim will be granted.

C.  § 1983 Claims for Retaliation (Count III, partial) and for Enforcement of the
Agreement (Count IV)

Plaintiffs also bring § 1983 actions based on two legal theories.  The first, a § 1983

retaliation claim, is a warmed-over version of their Section 504 claim (Count II), the only material

difference being the substitution of "1983" for "504."  The theory of Plaintiffs' second § 1983

claim is somewhat unclear but, at bottom, appears to be that Defendant deprived Plaintiffs of their

federal statutory rights while acting under color of state law when it failed to honor the terms of the

Agreement.  *See* Am. Compl. ¶¶ 81–82.

Integral to the resolution of both § 1983 claims is the Supreme Court's decision in *City of

Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005).  There, the Court held that "[t]he provision

of an express, private means of redress in [a] statute . . . is ordinarily an indication that Congress

did not intend to leave open a more expansive remedy under § 1983."  *Id.* at 121.  The Third

Circuit applied the principles of *Rancho Palos Verdes* to an IDEA dispute in *A.W. v. Jersey City

Public Schools*, 486 F.3d 791.  There, the court held that the private means of redress available

under both the IDEA and Section 504 of the Rehabilitation Act barred supplementary § 1983 relief

in an action based on the denial of a FAPE.  *Id.* at 803, 805.

*A.W.* is dispositive of Plaintiffs' § 1983 retaliation claim.  That claim is a nearly verbatim

recitation of Plaintiffs' claim under Section 504 and thus seeks relief under § 1983 for a violation

of the Rehabilitation Act—something that is expressly forbidden under *A.W.*

In pressing their second § 1983 claim, Plaintiffs attempt to distinguish *A.W.*  They point out

that the plaintiff there alleged that his IDEA rights were violated because he had been deprived of a

FAPE, which is the "precise type" of claim that the statute's "due process system was designed to

address and remedy." Resp. at 17. By contrast, Plaintiffs argue, their § 1983 "enforcement action" does not require me to engage in a complex factual FAPE inquiry because Defendant's breach of the Agreement was, in itself, a FAPE deprivation. Plaintiffs therefore contend that their § 1983 claim should survive because it requires only that I interpret and enforce and the terms of the Agreement, actions that fall outside the IDEA's "comprehensive remedial scheme." Resp. at 16. This, they conclude, materially distinguishes the present case from *A.W.*

I do not read *A.W.* so narrowly. The *A.W.* court reasoned that Congress did not intend for § 1983 to function as an end-run around the due process hearing and appeals processes provided in the IDEA. 486 F.3d at 803. Plaintiffs correctly note that their attempt to enforce the Agreement under § 1983 does not implicate the IDEA's administrative hearing process, but the logic of *A.W.* is still applicable here. Congress not only created a detailed administrative hearing system, it also created detailed alternative dispute resolution systems: the resolution and mediation processes. Moreover, Congress granted federal courts limited jurisdiction to enforce only those agreements reached through these processes. Consistent with *A.W.*, I find that Congress could not have intended for plaintiffs to use § 1983 to avail themselves of a federal forum after having bypassed the mediation and resolution processes provided under the IDEA. Defendant's 12(b)(6) motion is therefore granted as to Plaintiffs' attempt to enforce the Agreement pursuant to § 1983.

   D.   Claims for Retaliation Under the IDEA (Count III, partial)

Plaintiffs also recast Count II as a retaliation claim under the IDEA. It is well-established that individuals who face retaliatory conduct for exercising their IDEA-granted rights can bring claims under Section 504. There is, however, no express anti-retaliation provision in the IDEA itself or in its implementing regulations. The legal authority to support a free-standing, IDEA-

based retaliation claim is not apparent. What is clear is that Congress granted federal jurisdiction to decide IDEA claims only under limited circumstances, none of which applies here. Because Plaintiffs do not seek enforcement of a settlement agreement that was finalized within the resolution period, or reached through the mediation process, and because their claims do not arise out of a hearing officer's determination, this Court lacks jurisdiction to decide whatever IDEA-based retaliation claims Plaintiffs may have. Defendant's 12(b)(1) motion is therefore granted as to Plaintiffs' IDEA-based retaliation claim.

E. Claim for Breach of Contract (Count V)

Because there is no federal claim, supplemental jurisdiction over Plaintiffs' state law breach of contract action is lacking. Defendant's 12(b)(1) motion must be granted as to Count V as well.

**IV.    Conclusion**

This Court lacks subject matter jurisdiction to decide plaintiffs IDEA claims because of the procedural posture of the case under the statute.

Dismissal of Plaintiffs' Amended Complaint does not leave them without legal recourse to safeguard T.L.'s rights. As Defendant concedes, Plaintiffs can enforce the terms of the Agreement through a state law breach of contract action.[13] Plaintiffs may also proceed to a due process hearing based on Defendant's alleged failure to implement T.L.'s IEP, notwithstanding the waiver of rights in the Agreement. That remains an avenue for recourse because ODR hearing officers can only render decisions "on substantive grounds based on a determination of whether the child received a free appropriate public education," 20 U.S.C. § 1415(f)(3)(E)(i), and there is growing

---

[13] Given the existence of what appears to be a straightforward and enforceable contract, the Court cannot help but wonder whether the issue here is that Defendant is unwilling to fund Rev. Watson as a provider of compensatory educational services.

authority that, because the officer's sole statutory responsibility is to make certain that a student receives a FAPE, they are precluded from enforcing a settlement agreement. *J.K. v. Council Rock Sch. Dist.*, 833 F. Supp. 2d 436 (E.D. Pa. 2011) (Dalzell, J.); *H.E. v. Palmer*, --- F. Supp. 3d ---, No. CV 15-3864, 2016 WL 6276418, at *7 (E.D. Pa. 2016) (Beetlestone, J.); *see also H.C.*, 341 F. App'x at 689 (2d Cir.2009); *Justin R. ex rel. Jennifer R. v. Matayoshi*, No. CIV. 10-00657 LEK, 2011 WL 2470624, at *11 (D. Haw. June 17, 2011).  Indeed, in this case Plaintiffs allege that when they sought to enforce the Agreement through an administrative action, the hearing officer refused to consider the breach because he lacked jurisdiction.  Am. Compl. ¶ 10.

It is troubling and unfortunate that in the meantime a student is not being provided with remedial education that Defendant has agreed she is entitled to receive.  But given the finalization of the Agreement beyond the resolution period, I lack the power to vindicate her rights under the IDEA.

     /s/ Gerald Austin McHugh
United States District Judge
